WORKMAN LAW FIRM, PC
Robin G. Workman (Bar #145810)
robin@workmanlawpc.com
2325 3rd Street, Suite 329
San Francisco, CA 94107
Telephone:  (415) 782-3660
Facsimile:  (415) 788-1028

*Attorneys for Plaintiff, Jonathan Graham on
behalf of himself and all others similarly situated*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN GRAHAM, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>STRYKER EMPLOYMENT COMPANY, LLC, and DOES 1 through 50, inclusive,<br><br>Defendants. | No.   2:24-CV-01411-DJC-JDP<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT STRYKER EMPLOYMENT COMPANY, LLC'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY ADJUDICATION AGAINST STRYKER EMPLOYMENT COMPANY, LLC**<br><br>DATE:      July 9, 2026<br>TIME:      1:30 p.m.<br>CTRM:     7<br>JUDGE:    Hon. Daniel J. Calabretta<br><br>Complaint Filed:   April 11, 2024<br>Trial Date:          August 16, 2027<br><br>[Alameda County Superior Court Case No. 24-CV-007127] |

**TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION AND SUMMARY OF ARGUMENTS ....................................7

II.   PROCEDURAL BACKGROUND ...................................................12

III.  FACTUAL BACKGROUND ........................................................13

       A.    The Global Network Comprising "Stryker"................................13

       B.    Prior Litigation Over Failure to Reimburse Account Managers and
             And Unsigned Compensation Plans.........................................14

       C.    Mr. Graham's Employment With Stryker Employment And The
             Relevant Policies In Effect .................................................15

             1.    Neither Stryker Employment Nor Mr. Graham Signed Any
                   Compensation Plan .................................................16

             2.    The Compensation Plans Outline Stryker Employment's
                   Machinations to Avoid its Expense Reimbursement
                   Obligations.........................................................18

             3.    Stryker Employment Paid Commissions Late and Inaccurately ..23

       D.    Mr. Graham's Reasonable And Necessary Work-Related Expenses.....24

IV.   STANDARD ON SUMMARY ADJUDICATION .................................24

V.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT PRECLUDING
      SUMMARY ADJUDICATION OF STRYKER EMPLOYMENT'S LIABILITY
      FOR VIOLATIONS OF SECTION 2802 ........................................26

       A.    Sections 2802 and 2804 Bar Stryker Employment's Actions..................26

       B.    Stryker Employment's Authorities Provide It No Solace ........................31

VI.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT PRECLUDING
      SUMMARY ADJUDICATION OF STRYKER EMPLOYMENT'S LIABILITY
      FOR VIOLATIONS Of CALIFORNIA LABOR CODE SECTION 2751 .............33

VII.  ISSUES OF FACT EXIST PRECLUDING SUMMARY JUDGMENT ON
      MR. GRAHAM'S FIRST CAUSE OF ACTION FOR FAILURE TO PAY
      WAGES OWED ..................................................................36

VIII. ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON
      MR. GRAHAM'S LABOR CODE SECTION 226 CLAIM .................................39

VIV.  CONCLUSION ..................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrishamcar v. Oracle America, Inc.*,
  2022 WL 22860913 (Cal. Super. Dec. 19, 2022) ...................................................................... 34

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................................ 25, 26

*Barsamian v. City of Kingsburg*,
  597 F. Supp. 2d 1054 (E.D. Cal. 2009) ..................................................................................... 24

*Beard v. International Business Machines Corp.*,
  2019 WL 1516592 ( N.D. Cal. Apr. 7, 2019) ............................................................................ 33

*Burnett v. Duna USA Inc.*,
  2023 WL 9318510 (C.D. Cal. Mar. 20, 2023) ........................................................................... 33

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................................ 25, 26

*Comin v. International Business Machines Corp.*,
  2021 WL 463431 (N.D. Cal. Feb. 9, 2021) ............................................................................... 33

*Commeford v. Baker*,
  127 Cal. App. 111 (1954) .......................................................................................................... 32

*DeLeon v. Verizon Wireless, LLC*,
  207 Cal. App. 4th 800 (2012) ................................................................................................... 31

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
  42 Cal. 4th 554 (2007) ........................................................................................................*passim*

*Hopkins v. Stryker Sales Corp.*,
  2012 WL 1715091 (N.D. Cal. May 14, 2012) ....................................................................... 7, 14

*Jerozal v. Stryker Corp.*,
  2024 WL 374675 (C.D. Cal. Jan. 30, 2024) ............................................................................... 7

*Kerr's Catering Serv. V. Department of Industrial Relations*,
  57 Cal. 2d. 319 (1962) .............................................................................................................. 36

*Koehl v. Verio, Inc.*,
  142 Cal. App. 4th 1313 (2006) .................................................................................................. 31

*Lindell v. Synthes USA*,
  155 F. Supp. 3d 1068 (E.D. Cal. Jan. 6, 2016) .......................................................................... 31

*Marks v. Walter G. McCarty Corp.*,
  33 Cal. 2d 814 (1949) ................................................................................................ 10, 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ..................................................................................................... 25, 26

*McLeod v. Bank of America, N.A.*,
  2017 WL 6373020 (N.D. Cal. Dec. 13, 2017) .......................................................... 26

*Murphy v. Kenneth Cole Prods., Inc.*,
  40 Cal. 4th 1094 (2007) ............................................................................................ 11, 36

*Nein v. HostPro, Inc.*,
  174 Cal. App. 4th 833 (2009) ................................................................................... 32

*Nissan Fire & Marine Insurance Co., Ltd.*,
  210 F.3d 1099 (9th Cir. 1999) .................................................................................. 25

*Piccarreto v. Presstek, LLC*,
  2017 WL 3671153 (C.D. Cal. Aug. 23, 2017) ......................................................... 33, 34

*Picetti v. Stryker Corp.*,
  2023 WL 7386678 (N.D. Cal. Nov. 8, 2023) ............................................................. 7

*Plaza Home Mortgage, Inc. v. North American Title Co., Inc.*,
  184 Cal. App. 4th 130 (2010) ................................................................................... 28

*Prudential Ins. Co. v. Fromberg*,
  240 Cal. App. 2d 185 (1966) ..................................................................................... 33

*S. Cal. Gas Co. v. City of Santa Ana*,
  336 F.3d 885 (9th Cir. 2003) ..................................................................................... 25

*Schachter v. Citigroup, Inc.*,
  47 Cal. 4th 610 (2009) ........................................................................................ 8, 9, 31

*Smith v. Cardinal Logistics Management Corp.*,
  2009 WL 2588879 (N.D. Cal. Aug. 19, 2009) ......................................................... 29, 30

*Steinhebel v. Los Angeles Times Commc'ns*,
  126 Cal.App.4th 696, (2005) .................................................................................... 31

*Stryker Sales Corp.*,
  2013 WL 496358 (N.D. Cal. Feb. 6, 2013) .............................................................. 14, 15

*Stuart v. RadioShack*,
  641 F. Supp. 2d 901 (N.D. Cal. 2009) ..................................................................... 26

*Swafford v. International Business Machines Corp.*,
  408 F. Supp. 3d 1131 (N.D. Cal. 2019) ............................................................. 11, 34, 36

*T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Asso.*,
  809 F.2d 626 (9th Cir. 1987) ........................................................................................... 25

*Thai v. International Business Machines Corp.*,
  93 Cal. App. 5th 364(2023) ............................................................................................ 27

*Trosper v. Stryker Corp.*,
  2014 WL 4145448 (N.D. Cal. Aug. 21, 2014)................................................................ 7, 14, 15

*Trosper v. Stryker Corp.*,
  2015 WL 5915360 (N.D. Cal. Oct. 9, 2015)............................................................................. 15

*Walker v. Howmedica Osteonics Corp.*,
  2023 WL 3806356 (S.D. Cal. June 2, 2023)......................................................................*passim*

**Statutes**

820 ILCS 115/9.5(a)................................................................................................................. 18

California Business & Professions Code section 17200 .................................................................. 9

California Civil Code § 1638 ................................................................................................... 28

California Commercial Code section 1201 ............................................................................... 35

California Labor Code section 200 .......................................................................................... 36

California Labor Code sections 201-203 ................................................................................ 12, 36

California Labor Code section 203 .......................................................................................... 38

California Labor Code section 204 ....................................................................................... 13, 36

California Labor Code section 221 ........................................................................................ 8, 36

California Labor Code section 226 .....................................................................................*passim*

California Labor Code section 226(a)..................................................................................... 12, 39

California Labor Code sections 2698....................................................................................... 10

California Labor Code section 2751 ...................................................................................*passim*

California Labor Code section 2751(a)................................................................................. 10, 33, 34

California Labor Code section 2751(a) and (b) ........................................................................ 10

California Labor Code section 2751(b)............................................................................... 10, 33, 34

California Labor Code section 2802 .....................................................................................*passim*

California Labor Code section 2802(a) ........................................................................................ 9, 12

California Labor Code section 2804 ................................................................................ 8, 9, 26, 37

**Rules**

Federal Rule of Civil Procedure 56(a) ...................................................................................... 24, 25

Federal Rule of Civil Procedure 30(b)(6) ................................................................................ 10, 16

## I.    INTRODUCTION AND SUMMARY OF ARGUMENTS

As history has borne witness, defendant Stryker Employment Company, LLC ("Stryker Employment") will try anything to evade its expense reimbursement obligations under California Labor Code section 2802 ("Section 2802"). This is the *fifth time* Stryker Corporation or its subsidiaries, Stryker Employment and Howmedica Osteonics Corporation ("Howmedica"), have been embroiled in litigation in the California district courts over their attempts to evade their expense reimbursement obligations.[1] Two of these lawsuits ended in multi-million-dollar settlements after the courts certified the plaintiff classes. Undeterred by these rulings and subsequent settlements, Stryker Employment hatched another scheme to pass its operating expenses onto its California account managers. Plaintiff Jonathan Graham challenges this latest scheme.

On this go-around, Stryker Employment crafted a compensation structure to avoid reimbursing business expenses, first reducing California account managers' compensation by either .5% or 1%, and then later deducting $2,000 a month from account managers' compensation to address its expense reimbursement obligations.  In its documents, Stryker Employment told account managers the *sole purpose* for the reduction in compensation and subsequent deductions was to create a fund from which Stryker Employment would then "reimburse" account managers for their work-related business expenses. At the end of the year, or later on a quarterly basis, if account managers' requests for reimbursement for work-related business expenses did not exceed the amount of the compensation reduction or the deductions, Stryker Employment would conduct what it called a "true-up," and pay account managers the remaining amount of the reduced compensation and/or deductions that it withheld, e.g., if an account manager sought reimbursement for less than the $2,000 monthly deduction, Stryker Employment would pay the account manager the difference ($2,000 - $1,500 in reimbursements requested = $500 for the "true-up").  Even though Stryker Employment called this repayment a "bonus," there were no eligibility

---

[1] See *Jerozal v. Stryker Corp.*, 2024 WL 374675, at *1 (C.D. Cal. Jan. 30, 2024), *Picetti v. Stryker Corp.*, 2023 WL 7386678, at *1 (N.D. Cal. Nov. 8, 2023), *Hopkins v. Stryker Sales Corp.*, 2012 WL 1715091, at *5 (N.D. Cal. May 14, 2012), *Trosper v. Stryker Corp.*, 2014 WL 4145448, at *9 (N.D. Cal. Aug. 21, 2014).

requirements to receive the "bonus" other than seeking less reimbursements than the amount deducted or withheld by Stryker Employment from account managers' compensation. Indeed, if account managers sought no reimbursements, Stryker Employment paid account managers the entire amount of the reduced compensation, i.e., the 1% or .5%, or the amounts deducted, i.e., the $2,000 per month.

Stryker Employment's latest scheme flouts both the letter of Section 2802 and its policy, which is so strong as to be unwaivable under California Labor Code section 2804.[2] Recognizing this strong public policy, the California Supreme Court in *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 575 (2007), iterated the underlying purpose of Section 2802 is "to prevent employers from passing their operating expenses on to their employees," something Stryker Employment's latest maneuvers clearly do. While the *Gattuso* Court explained an employer may *increase* compensation to account for its reimbursement obligations, neither *Gattuso,* nor section 2802, allow an employer to force an employee to bear the cost of work-related expenses, either by *reducing* the employee's compensation, or by *taking deductions* from an employee's compensation.  Id. at 572-73.

Relying on decisions addressing an employer's right to use "chargebacks" to recoup commission payments if a customer cancels a contract, decisions that do not involve Section 2802 or reimbursement issues, Stryker Employment asserts it can engage in the outlined practices because such are set forth in its compensation plans. This argument is dead on arrival. Labor Code section 2804 forecloses this argument, stating: "Any contract or agreement, express or implied, made by any employee to waive the benefits of this article or any part thereof, is null and void . . . ."  Put simply, Mr. Graham could not agree to a contract that waived his right to reimbursement for his work-related business expenses.  Even cases to which Stryker Employment cites confirm this truism. *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610 (2009), which Stryker Employment cites for the proposition that by continuing employment employees are bound by the terms of compensation plans,

---

[2] The deductions also violate California Labor Code section 221 that prohibits deductions from wages, except for those specifically authorized by Section 224. The $2,000 a month is not the type of authorized deduction allowed by Section 224.

could not be clearer, stating that while an "employer may unilaterally alter the terms of an employment agreement," it can only do so "provided such alteration *does not run afoul of the Labor Code*." Id at 619 (emphasis added).  Unquestionably, Stryker Employment's compensation plans, which violate Section 2802, and are void under Section 2804, run afoul of the Labor Code.  As such, the plans provide Stryker Employment no solace.

Leaning into cases addressing chargebacks, Stryker Employment engages in further sleight of hand to give its actions the imprimatur of legality.  Regarding the $2,000 a month deducted from account managers' commissions, Stryker Employment asserts its actions are allowed because the commissions from which it took these deductions were not yet "earned." Stryker Employment's own documents belie this assertion. On page 1 of the document Stryker Employment sent all California account managers, titled "2023 Stryker Acute Care – CA & IL Expense Reimbursement Change," Stryker Employment stated: "[r]ather than **reducing** the standard commission rate of 1% (or .5% for New Hire/Emerging Market), Stryker will **reduce your monthly commissions by $2,000 per month** (totaling $24,000 per year)." (UMF 29)[3] (Emphasis added.)  Similarly, Cameron Ludwig, the Director of Sales – West for the Acute Care division explained the pre-2023 true-up "represents bonus owed on the difference between the **commissions earned** at the CA/IL rates and what **commissions earned** would have been at the baseline rates." Mr. Ludwig also explained that after the 2023 change, the true-up "represents the difference of **commissions withheld** vs. the amount of expenses that were reimbursed."[4] (Emphasis added.)  Stryker Employment did not equivocate: it took reductions and deductions from *earned commissions* to which account managers were entitled.  Based on the undisputed record evidence, Mr. Graham seeks summary adjudication of Stryker Employment's liability under his individual claim for violations of Section 2802(a).

Mr. Graham also seeks summary adjudication of his individual claims for violations of California Business & Professions Code section 17200 ("UCL") and the Private Attorneys

---

[3] In this motion, Mr. Graham refers to the Undisputed Material Facts in Support of the motion as "UMF."
[4] Declaration of Jon Graham In Support Of Opposition to Defendant's Motion for Summary Judgment, etc and in Support of Plaintiff's Cross-Motion for Summary Adjudication ("Graham Dec.") Exhibit G.

MSA MOTION (PLAINTIFF)                    -9-                    \MOTIONS\GRAHAMMSAMOTION

General Act of 2004, California Labor Code sections 2698, *et seq.* ("PAGA"), as predicated on violations of California Labor Code section 2751 ("Section 2751"), as well as Section 2802. The undisputed evidence establishes clear-cut violations of Section 2751(a) and (b). It establishes, unequivocally, Styker Employment employed Mr. Graham in California, the contemplated method of paying him involved commissions, and neither Stryker Employment nor Mr. Graham signed any of the commission plans that applied to Mr. Graham in violation of Section 2751(b). In addition, Stryker Employment did not provide Mr. Graham with a compensation plan in advance of his first day of work on August 2, 2021, or at all in 2022, in violation of Section 2751(a).

Stryker Employment does not dispute that neither its signature, nor Mr. Grahams', appear on any compensation plan. Stryker Employment also agrees the name "Stryker Employment Company, LLC" does not appear in any compensation plan.  Rather, in a one-page argument, it relies on the California Commercial Code for the proposition that because "Stryker" or "Stryker Medical" appear in the body of the plans, Stryker Employment Company, LLC "signed" the plans. Again, even the cases to which Stryker Employment cite defeat its assertions. Long ago, in *Marks v. Walter G. McCarty Corp.* 33 Cal. 2d 814, 820 (1949), when addressing the statute of frauds, the California Supreme Court explained:

> But it is a universal requirement that the statute of frauds is not satisfied unless it is proved that the name relied upon as a signature was placed on the document or adopted by the party to be charged with the intention of authenticating the writing. In other words, the defendant must intend to appropriate the name as a signature.

Stryker Employment presents *no evidence* to satisfy this requirement. Although Stryker Employment seeks to fill this evidentiary void through one line in the declaration of John Buczek, its Federal Rule of Civil Procedure ("FRCP") 30(b)(6) witness, this last gasp will not suffice.  Mr. Buczek testified, over and over, at his deposition that until 2024 he had no involvement in the drafting of the compensation plans, he does not know who drafted the compensation plans, he did not speak to anyone who did so, and he did not research who drafted the compensation plans.[5]. This limp showing will not suffice. Stryker

---

[5] Declaration of Robin G. Workman In Support Of Opposition to Defendant's Motion for Summary Judgment, etc and in Support of Plaintiff's Cross-Motion ("Workman Dec."), Exhibit B at 22:3-23:4, 108:17-25, 111:21-112:10, 134:14-21, 170:1-15.

Employment presents no admissible and competent evidence that it "placed" the names "Stryker" or "Stryker Medical" on the plans "with the intention of authenticating the writing" or that Stryker Employment "intend[ed] to appropriate the name(s) as a signature." The evidentiary failure arises because the assertion is not true.

The undisputed facts establish Stryker Employment is a separate legal entity that is a subsidiary of Stryker Corporation.  (UMF 2) The undisputed evidence also establishes that, as of December 31, 2024, Stryker Corporation had nearly 200 subsidiaries worldwide, including 12 in the United States that used the term "Stryker" in their names, such as Stryker Communications, Inc., Stryker Employment, Stryker Performance Solutions, LLC, Stryker Sales, LLC, and Stryker Sustainability Solutions, Inc., etc.  None of Stryker Corporation's subsidiaries is named "Stryker" or "Stryker Medical."  (UMF 3)  Mr. Buzcek admitted no one can discern from the face of the compensation plans what legal entity was intended by the plans use of the terms "Stryker" and "Stryker Medical." (UMF 47, 53, 59) Stryker Employment's assertions also do not comport with its actions in this case. Initially, Mr. Graham named Stryker Corporation and another Stryker entity as defendants.  Stryker Employment's counsel requested dismissal of these entities on the basis that the separate legal entities were not Plaintiff's employer, comporting with the truism that even Stryker Corporation treats all of its subsidiaries as separate legal entities.[6]

Hence, even assuming the California Commercial Code applies here, which Mr. Graham asserts it does not, Stryker Employment has not even met the requirements to which it cites. When analyzed in the proper framework, Stryker Employment's argument has no chance.  The California Supreme Court makes clear "statutes governing conditions of employment are to be construed broadly in favor of protecting employees." *Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1103 (2007). Courts confirm this basic principle applies to Section 2751.  See *Swafford v. International Business Machines Corp.*, 408 F. Supp. 3d 1131, 1153 (N.D. Cal. 2019) (Section 2751, as a statute governing the conditions of employment, should be construed broadly in favor of protecting employees).

---

[6] Workman Dec."), ¶ 33, Exhibit FF.

In *Walker v. Howmedica Osteonics Corp.*, 2023 WL 3806356, at *1-*3, *13 (S.D. Cal. June 2, 2023), the court rejected Stryker Employment's argument, alerting all the separate entities that substantial compliance with Section 2751 will not suffice. When interpreted liberally, as this Court must do, there is no question Stryker Employment did not comply with Section 2751, as neither its nor Mr. Graham's signature appear on the compensation plans. As such, Mr. Graham seeks summary adjudication of Stryker Employment's liability under his individual claim for violations of Section 2751.

Stryker Employment's summary adjudication requests for Mr. Graham's first cause of action for failure to pay wages and second cause of action for inaccurate wage statements fare no better. As outlined above, Stryker Employment did not pay Mr. Graham all the compensation owed to him, as it reduced his compensation by either .5% or 1% and then deducted $2,000 a month from his commissions to create a fund to use to "reimburse" Mr. Graham for his work-related business expenses. Stryker Employment's documents, and its actions, establish the reduction in compensation and deductions were taken from earned commissions to which Mr. Graham was entitled. As such, Mr. Graham is entitled to these wages under Labor Code sections 201-203, as well as waiting time penalties. In addition to the blatant failure to pay Mr. Graham his earned compensation, the undisputed evidence, based on Stryker Employment's documents, also establish that from July 2023 when Stryker Employment transferred to the SAP system, until Mr. Graham's employment ended in January of 2024, Stryker Employment routinely did not comply with Labor Code sections 201-202, as it paid the commissions late and the commissions paid were consistently inaccurate. These facts defeat any attempt at summary adjudication of this claim. Similarly, Labor Code section 226(a) requires employers to furnish accurate wage statements that set forth many things, including gross and net wages and all deductions taken from wages. Because Stryker Employment withheld wages owed to Mr. Graham, by definition, and did not reflect the $2,000 deductions, the wage statements were inaccurate, even assuming Stryker Employment actually furnished the wage statements are required

by Section 226.  Again, at a minimum, the factual disputes prevent summary adjudication of this claim against Plaintiff.

## II.    PROCEDURAL BACKGROUND

On April 11, 2024, Mr. Graham filed his Class Action, Individual, and PAGA Complaint (Compl.) in the Sacramento County Superior Court against Stryker Corporation, Stryker Employment, and Stryker Medical and Surgical Equipment Corporation. The Compl. alleges a putative class of account managers employed by defendants in California in the four years preceding the filing of the Compl. (Compl., ¶ 24). The Compl. alleges individual and class claims for sundry violations of the California Labor Code, including violations of sections 204 through 204, 226, 2802, and 221. (Compl. ¶¶ 30-52.) The third claim in the Compl. alleges the Section 2802 claim. (Compl., ¶¶ 42-47.) The Compl. also alleges a fifth claim under the UCL predicated on the aforementioned California Labor Code claims, as well as alleged violations of Section 2751. (Compl., ¶¶ 53-59.) Lastly, the Compl. alleges a sixth claim under the PAGA, also predicated on the aforementioned California Labor Code claims and alleged violations of Section 2751. (Compl., ¶¶ 60-63.)

On April 17, 2024, Defendants removed this action to this Court. On June 23, 2024, Mr. Graham filed a motion to remand the action to the state court. On February 4, 2025, this Court denied Mr. Graham's remand motion. (Docket #19)

Pursuant to a request by Defendant's counsel, on April 10, 2025, the parties filed a Stipulation re Dismissal, dismissing defendants Stryker Corporation and Stryker Medical and Surgical Equipment Corporation from this action without prejudice because neither entity was Mr. Graham's employer.[7] In an Order re Dismissal filed April 11, 2025, this Court approved the stipulation, leaving Stryker Employment the only defendant. (Docket # 26) The putative class in this action has yet been certified.

## III.    FACTUAL BACKGROUND

### A.  The Global Network Comprising "Stryker"

Stryker Corporation is a multinational medical technology company that owns

---

[7] Workman Dec. ¶33, Ex. FF.

intellectual property for a wide range of medical devices and equipment. (UMF 1) Stryker Employment is a subsidiary of Stryker Corporation. (UMF 2) As of December 31, 2025, Stryker Corporation had nearly 200 subsidiaries worldwide, including 12 in the United States that use the term "Stryker" in their names, including Stryker Communications, Inc., Stryker Employment, Stryker Performance Solutions, LLC, Stryker Sales, LLC, and Stryker Sustainability Solutions, Inc. (UMF 3) None is named "Stryker" or "Stryker Medical." (UMF 3) Howmedica is another U.S. subsidiary of Stryker Corporation and is the sole member of Stryker Employment. (UMF 2, 3) Mr. Graham's W-2's and wage statements only identify Stryker Employment as his employer. (UMF 4)

Stryker Employment has a medical division divided into "business units." In California, the business units are known as acute care, emergency care, SAGE and Procare and each have compensation plans.  (UMF 5) Within the acute care business unit, there are "product segments," including "patient care." (UMF 6) Although each business unit has its own compensation plans, the method Stryker Employment uses to avoid its reimbursement obligations are essentially the same. (UMF 39)

### B. Prior Litigation Over Failure to Reimburse Account Managers and And Unsigned Compensation Plans

This is not the first time Stryker Corporation, or one of its subsidiaries, faced a legal challenge to its expense reimbursement policy. In *Hopkins*, 2012 WL 1715091, at *5, a putative class of sales representatives across three of Stryker Corporation's four divisions challenged its business expense reimbursement policy as violating Section 2802 and the UCL. Pursuant to the challenged policy, in effect from at least April 20, 2007 through February 1, 2011, Stryker Corporation did not reimburse sales representatives for their routine business expenses. *Id*. at *1 Stryker Corporation's defense, based on self-serving testimony, was that it covered sales representatives' routine business expenses through an increase to their sales commissions. *Id*. at *2. Following certification of the class, the parties reached a common fund settlement in the amount of $4,250,000. *Hopkins. v. Stryker Sales Corp.*, 2013 WL 496358, at *2, *6 (N.D. Cal. Feb. 6, 2013).

In 2013, Stryker Corporation and Howmedica were sued in *Trosper*, 2014 WL 4145448, at *9, again by a class of sales representatives across four of Howmedica's divisions for violations of Section 2802 and the UCL. The class claims alleged that, from February 1, 2009 through October 1, 2012, defendants had a policy to not reimburse sales representatives for their routine business expenses, to which defendants responded, just as Stryker Corporation did in *Hopkins*, that they covered sales representatives' business expenses through their sales commissions. *Id*. at *1-*2. However, defendants never informed sales representatives that a portion of their commissions was intended to reimburse them for business expenses. *Id*. at *3. As in *Hopkins*, the district court certified the class, after which the parties reached a common fund settlement in the amount of $3 million. *Trosper v. Stryker Corp.*, 2015 WL 5915360, at *2 (N.D. Cal. Oct. 9, 2015).

In *Walker v. Howmedica Osteonics Corp.*, 2023 WL 3806356, at *1-*3, *13 (S.D. Cal. June 2, 2023), a sales representative sued Stryker Employment and Howmedica for violations of the UCL based on a predicate violation of Section 2751, by failing to provide him with a signed commission plan that modified his existing compensation structure. Howmedica was represented by counsel who represents Stryker Employment in this action. The *Walker* Court denied defendants' motion for summary judgment of the UCL claim predicated on violations of Section 2751, holding "an employer's failure to provide a signed copy of a modified contract of employment to an employee receiving sales commissions appears to violate the express terms of § 2751(b)." *Id*. at *13. So holding, the Court rejected defendants' argument that something less than strict compliance with Section 2751's requirements, *i.e.*, "substantial compliance," would satisfy the "elements and purpose of Section 2751." *Id*. *Walker* made Stryker Employment and its current counsel aware that courts require strict compliance with the letter of Section 2751.

## C. Mr. Graham's Employment With Stryker Employment And The Relevant Policies In Effect

Stryker Employment employed Mr. Graham from August 2, 2021, through January 5, 2024, as an account manager in California in the patient care product segment of Stryker

Employment's acute care business unit. (UMF 7) Styker Employment assigned Mr. Graham the "Sacramento" territory. (UMF 7) Like all account managers, Mr. Graham's duties included driving his personal vehicle throughout the assigned territory to client locations, such as hospitals, to sell products in the patient care portfolio. (UMF 7)

At all times during his employment, Stryker Employment paid Mr. Graham, either in whole, or in part, on a commission basis. For the balance of 2021 and through 2022, Styker Employment paid Mr. Graham a salary and he was eligible to receive commissions and bonuses under the Stryker Employment's New Hire/Emerging Markets Account Manager Compensation Program for Patient Care. (UMF 8) The terms "new hire" and "emerging market" refer to a compensation plan intended to provide newly-hired account managers with a salary while they are "getting up to speed" in their assigned territories, after which they move to a full commission-based compensation program. (UMF 9) In 2023, Mr. Graham transferred to a full commission-based compensation program. (UMF 10)

### 1. Neither Stryker Employment Nor Mr. Graham Signed Any Compensation Plan

Mr. Graham's first day at work at Stryker Employment was August 2, 2021. (UMF 7) After he started working, Mr. Graham had a telephone discussion with a Stryker Employment representative, in which she gave him a "brief" verbal overview of features of the 2021 Stryker Medical Acute Care Account Manager Compensation Plan, New Hire & Emerging Market Territories—CA & IL ("2021 Plan"). (UMF 43) Mr. Graham has no recollection of receiving the 2021 Plan before starting work. (UMF 43)

The 2021 Plan was effective from January 1, 2021 through December 31, 2021, and applied to all account managers in the patient care product segment of Stryker Employment's acute care business unit, who worked in California or Illinois and were hired on or after October 1, 2019. (UMF 16) The 2021 Plan had an Attachment A that set forth additional terms relating to the 2021 Plan, including the commission rates used to compensate account managers for their sales of products and to calculate bonuses. (UMF 17) Stryker Employment did not sign the 2021 Plan, or its Attachment A.  There is no signature line or other place in the 2021 Plan for a representative of Stryker Employment

to sign the 2021 Plan. (UMF 44) Indeed, the name "Stryker Employment Company, LLC" does not appear anywhere on the 2021 Plan, including its Attachment A. (UMF 46). Although the 2021 Plan contains the names "Stryker" and "Stryker Medical," John Buzcek, Stryker Employment's Federal Rule of Civil Procedure 30(b)(6) witness, admitted no one can discern from the face of the 2021 Plan what legal entity was intended by the plan's use of the terms "Stryker" and "Stryker Medical." (UMF 47)

Mr. Graham's signature is not on the 2021 Plan.  There is a single signature line on page 10 of the 2021 Plan, which is blank. (UMF 45) There is a single signature line on the last page of the Attachment A, which is blank as well. (UMF 45) Per Mr. Buczek, both signature lines were meant to be signed exclusively by the account manager, if at all. (UMF 45) Mr. Buczek confirmed Stryker Employment did not require account managers to sign their compensation plans, either handwritten or electronically. (UMF 48) Mr. Graham never signed the 2021 Plan, electronically or by hand. (UMF 49)

Stryker Employment replaced the 2021 Plan with the 2022 Stryker Medical-Acute Care Account Manager Compensation Plan New Hire & Emerging Market Territories-CA & IL and its Attachment A ("2022 Plan"), effective January 1, 2022, to December 31, 2022, and applicable to all account managers in the patient care product segment of Stryker Employment's acute care business unit, who worked in California or Illinois and were hired on or after October 1, 2020.(UMF 24) Stryker Employment did not sign the 2022 Plan, including its Attachment A. There is no signature line or other place in the Plan for a Stryker Employment representative to sign. (UMF 50) The name "Stryker Employment Company, LLC" does not appear anywhere in the 2022 Plan. (UMF 52) Mr. Buczek admitted no one can discern from the face of the plan what legal entity was meant by the terms "Stryker" or "Stryker Medical." (UMF 53) Buczek also admitted that, until 2024 he had no involvement in the drafting of the compensation plans, he does not know who drafted the compensation earlier plans, he did not speak to anyone who did so, and he did not research who drafted the earlier compensation plans.  (UMF 63) The signature lines on page 10 of the 2022 Plan and at the end of its Attachment A are blank. (UMF 51) Both signature lines were intended

to be signed by the account manager, if at all. (UMF 51) Mr. Graham does not recall seeing the 2022 Plan. He did not sign the plan or its Attachment A in any fashion. (UMF 54-55)

The 2022 Plan was replaced by the 2023 Stryker Medical Acute Care Account Manager Compensation Plan—California & Illinois ("2023 Plan"). (UMF 33) The 2023 Plan was effective from January 1, 2023 through December 31, 2023, and applied to all account managers in the patient care product segment of Stryker Employment's acute care business unit, who worked in California or Illinois between January 1, 2023 and December 31, 2023. (UMF 33) As with the 2021 and 2022 Plans, Stryker Employment did not sign the 2023 Plan, including its Attachment A, and there is no signature line or other place for a representative of Stryker Employment to sign the documents. (UMF 56) Like its predecessor plans, "Stryker Employment Company, LLC" does not appear anywhere on the 2023 Plan, including its Attachment A (UMF 58) Nor can it be discerned from the face of the plan what legal entity was meant by the terms "Stryker" or "Stryker Medical." (UMF 59) The single signature lines on page 10 of the 2023 Plan and at the end of its Attachment A are blank, and Mr. Buczek testified that the Attachment A was meant to be signed exclusively by the account manager, if at all. (UMF 57) Mr. Graham did not sign the 2023 Plan or its Attachment A, electronically or by hand. (UMF 60)

### 2. The Compensation Plans Outline Stryker Employment's Machinations to Avoid its Expense Reimbursement Obligations

During the class period, Styker Employment had in place compensation plans that applied solely to California and Illinois account managers. Stryker Employment used separate compensation plans for account managers working in these two states because California and Illinois are the only states that require employers to reimburse all employees, irrespective of compensation level, for work-related business expenses. In the 2021 Plan, Stryker Employment stated it would "reimburse" California and Illinois account managers' reasonable and necessary business expenses. (UMF 14, 21) However, this representation was false, and mere window-dressing intended to camouflage a scheme to make California and Illinois account managers fund their *own* business expenses, in circumvention of the wage and hour laws in those states, specifically, Section 2802 and 820 ILCS 115/9.5(a).

In all other states, Stryker Employment did not reimburse account managers for their reasonable and necessary business expenses. (UMF 11, 12, 13)

Stryker Employment paid account managers in the 48 states, excluding California and Illinois, sales commissions, including order and shipment commissions, based on what Stryker Employment called the "standard commission rate." (UMF 18) In 2021 and 2022, that rate was .5% higher than the reduced sales commission rate applicable to new hires in California and Illinois, and 1% higher than the reduced commission rate applicable to fully-commissioned account managers in those states. (UMF 18) As the 2021 Plan states:

> The applicable commission rates are set forth on Attachment A. These commission rates are 5% lower than the standard commission rate applicable to employees who work outside of CA or Il and are not eligible for direct reimbursement of their reasonable and necessary business expenses.

(UMF 18, Declaration of Robin G. Workman in Support of Plaintiff's Motion for Summary Adjudication Against Stryker Employment, LLC ("Workman Dec."), Ex. K, Graham Depo., Ex. 7, Bates#SYKGRAH00000281-290,270-80, at 283)

While Stryker Employment used this "reduced" rate to calculate the sales commissions paid to California and Illinois account managers, Stryker Employment calculated their annual performance-to-quota ("PTQ") bonuses using the higher "standard" commission rate. As the Attachment A to the 2021 Plan states:

> If 100% of the annual sales quota is achieved, the Account Manager will earn an 8% bonus calculated at 8% of total commissions earned for valid orders placed by the Account Manager during 2021 less any offsets or credits issued during 2021. The bonus amount will be calculated using the total commissions earned at the *standard commission rates* for all order activity during 2021 . . . regardless of payment timing. [¶] Once the Account Manager earns the Annual Sales Quota Bonus, he/she becomes eligible to earn the additional bonus payment. This additional bonus opportunity is calculated like the Annual Sales Quota Bonus, above.

(UFM 20, Workman Dec., Ex. K, Graham Depo., Ex. 7, Bates#SYKGRAH00000281-290, 270-280, at 279-80 (emphasis added).

Stryker Employment used the reserve of funds it accumulated by withholding .5% or 1% of the "standard commission rate" from sales commissions paid to California and Illinois account managers, to ostensibly "reimburse" account managers business expenses

on a semi-monthly basis, once they submitted the expenses though Stryker Employment's Concur expense reimbursement software platform with the required documentation and management approved the expenses. (UMF 14, 15, 21) It is a palpable fiction to call these payments "reimbursements" because Stryker Employment paid the "reimbursements" from the withheld commissions, not from Stryker Employment's own dime. (UMF 22)

Although Stryker Employment admits commission rates for Illinois and California account managers were .5% or 1% lower than those in the other 48 states, it ignores its documents that explain Stryker Employment *reduced* the rates for California and Illinois account managers *solely* to avoid its reimbursement obligations.  Unquestionably, the fund Stryker Employment set aside, from which it "reimbursed" account managers' work-related business expenses came from account managers' earned commissions, as Stryker Employment paid any unused amounts to the account managers.  Per the "Stryker Employment's Expense Management Bonus" policy set forth in the Attachment A to the 2021 Plan, account managers were eligible to receive a "bonus" if their annual "reimbursed" business expenses were less than the commissions withheld from them. (UMF 23) Stryker Employment called this repayment a "true-up."  Attachment A describes this "true-up" process, explicitly referring to the lower commission rate as a "reduced" rate, and recognizes the commissions from which the reduction was taken were "earned":

> **If commissions earned** for all order activity during 2021 (order commissions plus shipment commissions) plus reimbursed expenses for 2021 equal less than what the Account Manager would have earned if the Account Manager's commission rate had not been *reduced*, the Account Manager will be eligible to receive an Expense Management Bonus Q1 2022. This Expense Management Bonus will be calculated as follows: (the amount the Account Manager would have **earned in commissions** at the standard commission rate) minus (the Account Managers' commissions earned at the *reduced* rate plus submitted expenses).

(UMF 23); Workman Dec., Ex. K, Graham Depo., Ex. 7, Bates#SYKGRAH00000281-290, 270-280, at 288 (emphasis added). Thus, the "true-up" process was not a "bonus" to account managers.  Rather, it was a delayed payment from commissions account

managers already earned that Stryker Employment held hostage for potential use to "reimburse" account managers for work-related business expenses.

The 2022 Plan was effective January 1, 2022 to December 31, 2022, and applied to all account managers in the patient care product segment of Stryker Employment's acute care business unit, who worked in California or Illinois and were hired on or after October 1, 2020. (UMF 24) Like the 2021 Plan, it compensated Mr. Graham through a base salary, commissions and a bonus opportunity. (UMF 25) Although it purported to "reimburse" account managers for their reasonable and necessary business expenses, the 2022 Plan, in lockstep with the 2021 Plan, applied a "reduced" commission rate to Mr. Graham's sales, which was .5% lower than the standard commission rate, setting this amount aside from which Stryker Employment would "reimburse" Mr. Graham for his work-related business expenses. Like the 2021 plan, if Mr. Graham's requests for reimbursement amounted to less than his withheld earned commissions, Stryker Employment paid Mr. Graham the difference through a "true-up". (UMF 26, 27) The specific verbiage of the 2022 plan mirrored that of the 2021 Plan, stating:

> **"[i]f commissions earned** for all order activity during 2022 (order commissions plus shipment commissions) plus reimbursed expenses for 2022 equal[ed] less than what the Account Manager would have earned if the Account Manager's commission rate had not been **reduced."** The Expense Management Bonus was calculated as follows: "(the amount the Account Manager **would have earned in commissions** at the standard commission rate) minus (the Account Managers' **commissions earned** at the **reduced** rate plus submitted expenses)."

(UMF 27; Workman Dec., Ex. L, Graham Depo., Ex. 10, Bates#SYKGRAH00000248-257, 186-195, at 255 (emphasis added)).[8]

Effective January 1, 2023, Stryker Employment instituted a change in its expense reimbursement policy applicable to all California and Illinois account managers in Stryker Employment's acute care business unit. Stryker Employment announced this policy change in a document titled 2023 Stryker Acute Care, CA and IL Expense Reimbursement Change that was disseminated in or about February, 2023. (UMF 28) In notifying account

---

[8] Like the 2021 Plan, the Attachment A entitled Mr. Graham to an annual PTQ bonus calculated using the standard commission rate, not the "reduced" rate. (UMF 26)

managers of the change, Stryker Employment explained "[r]ather than reducing the standard commission rate" by .5% or 1%, Stryker Employment would "*reduce* your [account managers'] monthly commissions by $2,000 per month (totaling $24,000 per year)" and earmark the deducted funds to pay up to $24,000 of business expenses per account manager per year, *i.e.*, the "Annual Expense Target." (UMF 29; italics added) Stryker Employment arrived at the "Annual Expense Target" by analyzing the average monthly business expenses reported by account managers. (UMF 29) The 2023 policy also provided for a "true-up." If an account manager's "reimbursed" business expenses amounted to less than the Expense Target, *i.e.*, less than $6,000 per quarter (3 months X $2,000), Stryker Employment paid the account manager what it called an "Expense Management Bonus" equal to the difference between the actual expenses submitted for "reimbursement" and the target amount. (UMF 30) These "true-ups" were done on a quarterly basis and any bonus was taxed as a regular commission. (UMF 30, 31)

The "reimbursements" afforded by this policy change continued to be fictitious because Stryker Employment required California and Illinois account managers to bear the cost of their own work-related business expenses up to the $24,000 Annual Expense Target from their own commissions. (UMF 32) After the expense reimbursement change in 2023, Mr. Graham's monthly commission reports reflected a $2,000 deduction from his earnings, labeled "CA/IL Expense Withholding." (UMF 37)

Stryker Employment replaced the 2022 Plan with the 2023 Stryker Medical Acute Care Account Manager Compensation Plan—California & Illinois ("2023 Plan"). (UMF 33) The 2023 Plan was effective from January 1, 2023 through December 31, 2023, and applied to all account managers in the patient care product segment of Stryker Employment's acute care business unit, who worked in California or Illinois between January 1, 2023 and December 31, 2023. (UMF 33) Under the 2023 Plan, Mr. Graham was compensated by commissions, a draw, and a bonus opportunity. (UMF 34)

Under the heading, "Expenses Reimbursement," the 2023 Plan again paid lip service to Stryker Employment's obligation to "reimburse eligible employees in California

and Illinois for all reasonable and necessary expenses." Even so, the 2023 Plan continued to require account managers to fund their own work-related business expenses from their commissions, a portion of which Stryker Employment "withheld" and "set aside" and redirected to "reimburse" the expenses, and then permitted account managers to recapture the withheld commissions as a "bonus" through a "true-up".  (UMF 35, 36) Consistent with the 2023 Expense Reimbursement Change, the 2023 Plan stated:

> The calculation of your advance on Commissions and the calculation of your potential commission earnings will be *reduced* by $2,000 each month (for a total of $24,000 per year) to take into account the sales representatives' Annual Expense Target assigned by Stryker. Sales representatives who incur fewer business expenses than the Annual Expense Target will be eligible to receive a quarterly Expense Management Bonus equal to the difference between actual expenses submitted and the Annual Expense Target, subject to the terms and conditions of the bonus payment.

(UMF 35, Workman Dec., Ex. N, Graham Depo., Ex. 13, Bates#SYKGRAH00000196-218, at 203; italics added)[9]

### 3.  Stryker Employment Paid Commissions Late and Inaccurately

Stryker Employment's assertion that it paid Mr. Graham all wages owed to him, and never paid the wages late, ignores reality.  First, as outlined above, Stryker Employment reduced and took deductions from Mr. Graham's compensation, using that fund to "reimburse" Mr. Graham for his work-related business expenses.  Mr. Graham is entitled to the amount of the reduction and deductions.

Second, Stryker Employment's documents establish, at least after the transition to the SAP system in July 2023, commission payments were late and inaccurate.  In a phalanx of emails, Stryker Employment explained in August of 2023, that due to the "data and visibility challenges" of the SAP system, Stryker Employment was "delayed in our ability to accurately calculate commissions for July."  In September of 2023, Stryker Employment notified account managers that due to the problems with the SAP system, Stryker

---

[9] Identical provisions appear in the compensation plans effective in 2024 and 2025, applicable to California and Illinois account managers in the patient care product segment of Stryker Employment's acute care business unit. (UMF 38) Moreover, Stryker Employment followed a comparable practice for account managers working in California and Illinois in other business units, including emergency care. (UMF 39)

Employment would not pay commissions earned in July or August until September 29. Mr. Graham's Regional Manager, Caitlin Rosales, recognized on September 27, 2023, that the issues with SAP resulted in "incorrect paychecks." On October 12, 2023, Ms. Rosales again recognized commissions were still "incorrect." In November 22, 2023, management recognized commissions were underpaid. Mr. Graham made many complaints about the inaccurate and late commissions. While management recognized commissions were "missed" and "inaccurate", the response was to be patient. (Graham Decl. ¶ 17, Ex. C.)

When his employment ended, Mr. Graham notified Stryker Employment that his final wages were not paid on the last day of his employment, or within 72 hours. (Graham Decl., ¶ 18, Ex. D.) Stryker Employment did not pay Mr. Graham his final wages until months after his employment ceased, sending him checks on January of 2024, one in March or April of 2024, and a final one in August of 2024. (Graham Decl. ¶ 19, 22, Ex. F.)

### D. Mr. Graham's Reasonable And Necessary Work-Related Expenses

In executing his job duties for Stryker Employment, Mr. Graham incurred cell phone charges, expenses purchasing home office supplies and electronic equipment, such as computers and printers, internet charges, non-commute mileage, and parking and toll charges, among other expenses. (UMF 40) These work-related expenses were all "reasonable and necessary," as Stryker Employment defined that phrase. A document entitled Stryker's Expense Reimbursement for California Sales Representatives dated January 2021, states reimbursable "reasonable and necessary business expenses" included, but were not limited to, non-commute mileage, business-related parking, tolls, postage, office supplies, faxes, photocopies, cellular phones and hotspots for business use. Oil changes, car depreciation, repairs and maintenance, and gas were included with the mileage reimbursement rate established by the Internal Revenue Service." (UMF 14)

Mr. Graham submitted all his business expenses through Stryker Employment's Concur expense reimbursement software platform. During his employment with Stryker Employment, there were no business expenses Mr. Graham incurred, which he did not submit to the Concur platform together with the required receipts, except for one meal for

which he did not submit a table receipt. (UMF 41) Stryker Employment required that all of Mr. Graham's requests for reimbursement be approved by his manager. (UMF 15) Mr. Graham's monthly business expense "reimbursements" were identified on his wage statements as "Concur Expense[s]," and were added to his commission earnings to arrive at the total amount of "earnings" on which he was taxed. (UMF 42)

## IV.    STANDARD ON SUMMARY ADJUDICATION

A party may move for summary adjudication on part of any claim or defense. Fed. R. Civ. P. 56(a). A motion for summary adjudication is governed by the same standard as a typical motion for summary judgment. *Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054, 1061 (E.D. Cal. 2009). "The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial,'" and where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party bears the burden of persuasion at trial, *e.g.*, where the moving party seeks summary judgment on its own claim or defense, the moving party must establish "beyond controversy every essential element of its" claim or defense. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). If the

moving party meets its burden, the burden shifts to the non-movant to "demonstrat[e that] the evidence, taken as a whole, could lead a rational trier of fact to find in its favor." *Id*.

Once the moving party meets its initial burden, the non-moving party must identify "specific facts," supported by affidavits or admissible discovery material, showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Nissan Fire & Marine Insurance Co., Ltd.*, 210 F.3d 1099, 1103 (9th Cir. 1999). Viewing the evidence in light of the evidentiary standard of proof applicable at trial, the court determines whether those "specific facts," coupled with undisputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. *Anderson*, 477 U.S. at 255; *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Asso.*, 809 F.2d 626, 631 (9th Cir. 1987). In such a case, summary judgment is inappropriate.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.  However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## V.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT PRECLUDING SUMMARY ADJUDICATION OF STRYKER EMPLOYMENT'S LIABILITY FOR VIOLATIONS OF SECTION 2802

### A.  Sections 2802 and 2804 Bar Stryker Employment's Actions

Section 2802 requires "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." Section 2802(a). An employer who "knows or has reason to know that the employees have incurred reimbursable expenses" owes "a duty to exercise due diligence and take any and all reasonable steps to ensure" the employees are fully reimbursed. *Stuart v. RadioShack*, 641 F. Supp. 2d 901, 904 (N.D. Cal. 2009). The duty of diligence is fulfilled only when "an employer adequately undertakes systemic efforts to ensure all employees are reimbursed (*e.g.*, through promulgation of policies, companywide training, etc.)." *McLeod v. Bank of America, N.A.*, 2017 WL 6373020, at *8 (N.D. Cal. Dec. 13, 2017).

MSA MOTION (PLAINTIFF)                           -26-                           \MOTIONS\GRAHAMMSAMOTION

The purpose of Section 2802 is "to prevent employers from passing their operating expenses on to their employees." *Gattuso* 42 Cal. 4th at 562. For example, "if an employer requires an employee to travel on company business," the employer must "reimburse the employee for the cost of that travel." *Id*. California Labor Code section 2804 reflects this strong public policy as it makes employees' rights under Section 2802 unwaivable, providing: "[a]ny contract or agreement, express or implied, made by any employee to waive the benefits of this article or any party thereof, is null and void." See also *Stuart*, 641 F. Supp. 2d at 903. In no universe is this strong public policy served if an employer, such as Stryker Employment, either reduces or takes deductions from employees' compensation to cover work-related expenses employees incur to do their jobs.

Mr. Graham presents ample evidence to carry the initial burden of production, and the ultimate burden of establishing beyond controversy every element of his Section 2802 claim. The elements of the Section 2802 claim are: (1) the employee made expenditures; (2) the expenditures were incurred in direct consequence of the employee's discharge of his or her duties, or obedience to the directions of the employer, and (3) the expenditures were reasonable and necessary. *Thai v. International Business Machines Corp.*, 93 Cal. App. 5th 364, 370(2023).

It is undisputed that Mr. Graham incurred business expenses in performing his job duties for Stryker Employment, and that the Expense Reimbursement for California Sales Representative policy recognized these expenses as "reasonable and necessary expenses directly incurred as a result of [his] job duties." It is also undisputed that Mr. Graham submitted these expenses to Stryker Employment's Concur system, as directed by the Expense Reimbursement for California Sales Representatives policy. In fact, there were no business expenses that he had incurred, that he did not submit to the Concur system together with the required receipts, except for one meal for which he did not submit a table receipt. It is also undisputed that Mr. Graham's managers approved all of the work-related expenses he submitted for reimbursement.

However, Stryker Employment did not fulfil its duty to reimburse Mr. Graham for his work-related business expenses. Instead, Stryker Employment implemented a fictional "reimbursement" policy whereby Mr. Graham paid for his work-related business expenses from his own commissions. Under the 2021 and 2022 Plans, Mr. Graham's submitted expenses were "reimbursed" to Mr. Graham out of the reserves Stryker Employment amassed by compensating him at a "reduced" commission rate that was .5% less than the standard commission rate. As Mr. Graham testified: "they didn't reimburse me for anything. I paid my own expenses . . . So if it was the phone bill, if it was the wifi, it was parking, meals, I would pay for them . . . they were withholding commissions and using that pool of money to redistribute our own money to us to cover expenses." (UMF 22, Workman Dec., Ex. B, Graham Depo., 44:17-45:11, 88:22-93:7.)

This testimony coincides with the plain language of the 2021 and 2022 Plans. Those plans plainly state, not once, *but twice,* that the commission rates of the California account managers were **"reduced"**, in describing the percentage spread between the commission rate applicable to California and Illinois account managers and the standard commission rate applicable to account managers working in the other 48 states. The plans also established that the commissions from which the reduction was taken were "earned," specifically sating "[i]f **commissions earned** for all order activity . . ." Stryker Employment's actions establish Mr. Graham and the other California account managers earned the commissions at the standard rate, as through the "true-up" process, Stryker Employment paid Mr. Graham, and the other California account managers, the difference between the amount their commissions were reduced and the amount requested for reimbursement. As Mr. Graham testified, the "true-up" just reflected "the balance left from the income they withheld, minus expenses submitted." (UMF 23, Workman Dec., Ex. K, Graham Depo., 178:18-20) There were no other eligibility requirements for the "true-up."

Stryker Employment cannot contend the 2021 and 2022 Plans do not mean what they say. This contention would contravene fundamental tenets of contract construction that give the greatest weight to a contract's plain language and avoid interpretations that

rendered any portion superfluous, void or inexplicable *Plaza Home Mortgage, Inc. v. North American Title Co., Inc.* 184 Cal. App. 4th 130, 135-36, 138 (2010); Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not govern an absurdity"). Stryker Employment also cannot argue the word "reduced" should be construed as merely drawing a comparison between the commission rate to which Stryker Employment and Mr. Graham agreed and a higher hypothetical rate not part of the parties' bargain. The standard commission rate is neither hypothetical nor peripheral to the parties' bargain. The 2021 and 2022 Plans provided Mr. Graham's annual PTQ Bonuses would be calculated "using the total commissions earned at standard commission rates . . ." Thus, Stryker Employment used the higher standard commission rate in calculating bonuses to incentivize Mr. Graham to meet his annual sales quota, but reduced that rate in cooking up a means to circumvent its obligations under Section 2802.

The 2023 Plan fares no better. It compensated Mr. Graham for product sales using the standard commission rate but *reduced* his monthly commissions by $2,000, and redirected those funds to "reimburse" his work-related business expenses up to an "Annual Expense Target" of $24,000. Only if Mr. Graham's submitted business expenses were less than that target would he be eligible to receive a quarterly "Expense Management Bonus" or "true-up." Again, the "bonus" or "true-up" was nothing more than the difference between Mr. Graham's submitted expenses and the target amount withheld from his compensation.

Stryker Employment cannot argue the 2023 Plan complies with the "lump-sum method" of reimbursement recognized in *Gattuso*, 42 Cal. 4th at 571. Per *Gattuso*, *id.*, an employer may satisfy its reimbursement obligation under Section 2802 by the "lump-sum method." This method permits the employer to combine wages and business expenses in a "single enhanced employee compensation payment"—enhanced in the sense of that it *increases* the base salary or commission rate an employee would otherwise be paid by an amount that will reimburse the employee for his or her business expenses. *Id*. at 572-73, 575. Post-*Gattuso* courts construe this method to require an "up-front, lump-sum payment" to the employee, which *exceeds* the amount of base salary or commission rate to which

the employee would otherwise be entitled, and *includes* the amount being paid to reimburse business expenses. *Smith v. Cardinal Logistics Management Corp.*, 2009 WL 2588879, at *3-*4 (N.D. Cal. Aug. 19, 2009). The use of this method is subject to three other provisos: (1) the employer establish some means to identify the portion of overall compensation intended as expense reimbursement; (2) the amounts so identified must be sufficient to fully reimburse the employee for all expenses actually and necessarily incurred; and (3) "any tax consequences that result from the employer's choice of reimbursement method should be considered in determining whether a particular payment provides the full measure of reimbursement that section 2802 requires." *Gattuso*, 42 Cal. 4th at 571, 575.

Stryker Employment cannot rely on this methodology for several reasons. First, in its responses to Mr. Graham's interrogatories, it denied that it was relying on this methodology. It asserted: "it did not require Account Managers in Acute Care to pay from earned commissions their necessary business expenses that they incurred in direct consequence of the discharge of their duties. Defendant directly reimbursed Account Managers for all of their reasonable and necessary business expenses." (UMF 61)

Second, Stryker Employment did not pay Mr. Graham an "up-front, lump sum payment" that included both the compensation amount paid for labor performed and the amount paid to reimburse business expenses. *Smith*, 2009 WL 2588879, at *3-*4. In fact, after the expense reimbursement change in 2023, Mr. Graham's monthly commission reports reflected a $2,000 *deduction*, labeled "CA/IL Expense Withholding," from his earnings. In *Smith*, the Court addressed a comparable compensation policy, by which business expenses were already deducted from the driver employees' rates of compensation. *Id*. at *3-*4, Denying the employer's motion for partial summary judgment on plaintiffs' Section 2802 claim, the Court observed that the only payment the drivers received occurred after expenses had been already deducted, refused to treat the deductions as the functional equivalent of expense reimbursements, and held that the

compensation system was "too far removed from what [*Gattuso*] had in mind" and was not "equivalent to the lump-sum payment method endorsed by" *Gattuso*." *Id*.

Third, Mr. Graham's wage statements reflect that his monthly business expenses, identified as "Concur Expense[s]," were added to his commission earnings to arrive at the total amount of "earnings" that would be taxed. The expense management bonuses or "true-ups" were also taxed like commission income. These practices turn a blind eye to *Gattuso*'s admonition that "any tax consequences that result from the employer's choice of reimbursement method should be considered in determining whether a particular payment provides the full measure of reimbursement." *Gattuso*, 42 Cal. 4th at 571. Being taxed on his business expense reimbursements, as though they were earnings, Mr. Graham was not fully reimbursed for all expenses actually incurred, as *Gattuso* mandates. *Id*. at 575.

### B. Stryker Employment's Authorities Provide It No Solace

Ignoring Section 2804, Stryker Employment argues its actions are permitted because it outlined its schemes in the compensation plans. To support its argument, Stryker Employment cites to a string of cases addressing chargebacks when customers cancel a contract. None of the cases involve Section 2802 or reimbursement obligations or circumstances even close to the facts before the court.

Stryker Employment began its soliloquy with citation to *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610, 620 (2009), for the tenet employees who continue employment are bound by terms set forth in compensation plans. *Schacter* did not discuss section 2802 or 2804. In its quest for jurisprudential nuggets, Stryker Employment missed the salient takeaway from *Schachter*. *Schachter* was clear an "employer may unilaterally alter the terms of an employment agreement, *provided such alteration does not run afoul of the Labor Code*," something Stryker Employment's plans clearly do. Id at 619. (Emphasis added.)

The other authorities to which Stryker Employment cites are equally inapplicable. *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1331 (2006), addressed a circumstance where commission plans for an internet service allowed the employer to charge back previously advanced sales commissions when customers canceled contracts within a certain number

of days after activation. Section 2802 was not at issue. Similarly, *DeLeon v. Verizon Wireless, LLC,* 207 Cal. App. 4th 800, 808 (2012), discussed the premise that "when a charge back occurs, the retail sales representative receives a reduced amount of the next advance to account for the earlier advance that never became a commissionable sale." Section 2802 also was not an issue. *Lindell v. Synthes USA,* 155 F. Supp. 3d 1068, 1085 (E.D. Cal. Jan. 6, 2016), addressed the same type of circumstance, stating: "an employer may make an advance on commissions to employees "and later reconcile[ ] any overpayments by deductions from future commissions." In *Lindell,* however, the court was clear that not all chargebacks are allowed, as the employer could not "charge back" more than was paid in the advance commission. *Lindell* cited to *Steinhebel v. Los Angeles Times Commc'ns*, 126 Cal.App.4th 696, 707, (2005), on which Stryker Employment also relies. *Steinhebel* also involved a chargeback situation where the employer advanced commissions and then took chargebacks if the customer cancelled the contract within 28 days. These cases have nothing to do with this action.

The point of these cases, which is not present here, is if an employer advances a commission on a sale, and that sale later falls through and the employer does not receive payment for the sale, chargebacks are allowed.  This is not what we have here.  Stryker Employment never advanced anything and is not recouping something paid, rather, Stryker Employment reduced or took deductions from commissions to create a fund it used to satisfy its "reimbursement" obligations. This fact could not be more clear.  On page 1 of the document Stryker Employment sent all California account managers, titled "2023 Stryker Acute Care – CA & IL Expense Reimbursement Change," Stryker Employment stated: "[r]ather than **reducing** the standard commission rate of 1% (or .5% for New Hire/Emerging Market), Stryker will **reduce your monthly commissions by $2,000 per month** (totaling $24,000 per year)." (UMF 29) (Emphasis added.)  Similarly, Cameron Ludwig, the Director of Sales – West for the Acute Care division explained the pre-2023 true-up "represents bonus owed on the difference between the **commissions earned** at the CA/IL rates and what **commissions earned** would have been at the baseline rates."  Mr. Ludwig also

explained that after the 2023 change, the true-up "represents the difference of **commissions withheld** vs. the amount of expenses that were reimbursed."[10]  (Emphasis added.)  This process has nothing to do with advances or chargebacks – but rather is simply a ploy whereby Stryker Employment can foist its reimbursement obligations onto account managers.

The other cases on which Stryker Employments are even less pertinent.  In *Nein v. HostPro, Inc.*, 174 Cal. App. 4th 833, 853 (2009), the plaintiff argued defendant terminated him to avoid paying commission on a deal that closed one month after his termination.  Section 2802 was not discussed.  *Commeford v. Baker,* 127 Cal. App. 111, 117 (1954), similarly addressed the question of whether employees could recover commissions on sales where goods were delivered after their termination.  These cases, like *Prudential Ins. Co. v. Fromberg,* 240 Cal. App. 2d 185 (1966), contain no discussion of Section 2802 or the prohibitions in Section 2804.

## VI. THERE IS NO GENUINE ISSUE OF MATERIAL FACT PRECLUDING SUMMARY ADJUDICATION OF STRYKER EMPLOYMENT'S LIABILITY FOR VIOLATIONS Of CALIFORNIA LABOR CODE SECTION 2751

Subdivision (a) of Section 2751 provides whenever an employer enters into a contract of employment with an employee, the employer must provide a written contract to the employee if the employee's payment involves commissions for services rendered in California. Subdivision (b) of Section 2751 requires the employer must give a "signed" copy of the contract to the employee and obtain a receipt for the contract from the employee. A violation of Section 2751 may serve as the predicate for a claim under the UCL or PAGA. See, e.g., *Burnett v. Duna USA Inc.*, 2023 WL 9318510, at *1 (C.D. Cal. Mar. 20, 2023); *Walker*, 2023 WL 3806356, at *13 ("[t]he unlawful prong of the UCL prohibits 'anything that can properly becalled a business practice and that at the same time is forbidden by law'"); *Comin v. International Business Machines Corp.*, 2021 WL 463431, at *3 (N.D. Cal. Feb. 9, 2021) (a remedy for a violation of Section 2751 may be available under the ULC and PAGA); *Beard v. International Business Machines Corp.*, 2019 WL 1516592, at *6 ( N.D.

---

[10] Graham Dec. Exhibit G.

Cal. Apr. 7, 2019) ("This violation may nevertheless serve as a predicate violation for plaintiff's Section 17200 [claim]"); *Piccarreto v. Presstek, LLC*, 2017 WL 3671153, at *6 (C.D. Cal. Aug. 23, 2017) (awarding PAGA penalties based on violation of Section 2751).

The evidence establishes Stryker Employment employed Mr. Graham in California and the "contemplated method of pay[ing]" him involved commissions. Section 2751(a) states: "Whenever an employer enters into a contract with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions . . .". Even so, none of the compensation plans applicable to Mr. Graham bears his signature and Mr. Graham does not recall signing any of them. In addition, none of the plans bears Stryker Employment's signature. There was no place for it to sign any of the Plans. Mr. Buczek admitted the signature lines on Mr. Graham's compensation plans were meant for Mr. Graham's signature, not Stryker Employment's. Mr. Buczek also admitted no one can discern from the face of those plans what legal entity the plans were referring to when they used the terms "Stryker" or "Stryker Medical."

Based on these uncontroverted facts, Stryker Employment violated Section 2751(b). See *Piccarreto*, 2017 WL 3671153, at *6, and *Walker*, 2023 WL 3806356, at *13, In *Piccarreto*, 2017 WL 3671153, at *6, the Court imposed PAGA penalties against the employer for violating Section 2751 where plaintiff received only an unsigned commission agreement. The Court made short shrift of defendant's argument that the absence of a signature was not dispositive because plaintiff admittedly agreed to the terms of his offer letter. *Id*. at *2. The Court stated in no uncertain terms, "That is beside the point . . . In failing to provide Piccarreto with a 'signed' copy of the 2015 Compensation Plan, which is a commission agreement, Presstek violated the express terms of Section 2751(b)." *Id*.

Moreover, given their close involvement in *Walker*, 2023 WL 3806356, 3806356, at *13, Stryker Employment and its counsel know "substantial compliance" will not suffice, an argument roundly rejected by the courts. See also *Swafford v. International Business Machines Corp.*, 408 F. Supp. 3d 1131, 1153 (N.D. Cal. 2019). (Section 2751, as a statute

governing the conditions of employment, should be construed broadly in favor of protecting employees). Those arguments are no more valid now than they were in *Walker*.

The undisputed evidence also establishes Stryker did not provide Mr. Graham with the 2021 Plan before he first started performing services for Stryker Employment, as Section 2751(a) mandates. *Abrishamcar v. Oracle America, Inc.*, 2022 WL 22860913, at *5 (Cal. Super. Dec. 19, 2022); see also *Swafford*, 408 F. Supp. 3d at 1153 (citing *Abrishamcar* with approval). His first encounter with the 2021 Plan was "during his first day or two" at work, when he had a telephone conversation with a Stryker Employment representative about the plan. Mr. Graham was never provided with the 2022 Plan (signed or unsigned). These violations are distinct from the violation that arises when an employee is employed pursuant to an unsigned commission contract. *Abrishamcar*, 2022 WL 22860913, at *7.

Stryker Employment does not dispute that neither its signature, nor Mr. Grahams', appear on any compensation plan. Stryker Employment agrees the name "Stryker Employment Company, LLC" does not appear in any compensation plan.  In a scant, one-page argument, relying on the California Commercial Code, Stryker Employment asserts that because "Stryker" or "Stryker Medical" appear in the body of the plans, Stryker Employment Company, LLC "signed" the plans. This argument does not get off first base.

Even if the Section 1201 of the California Commercial Code, which be definition applies to commercial transaction, applied to wage claims under the California Labor Code, which Mr. Graham disputes, the cases to which Stryker Employment cite establish, to even float this argument, Stryker Employment would need to prove, by admissible evidence, "the name relied upon as a signature was placed on the document or adopted by [Stryker Employment] with the intention of authenticating the writing." In other words, Stryker Employment needed to present evidence it "intended to appropriate the name as a signature." *Marks v. Walter G. McCarty Corp.* 33 Cal. 2d 814, 820 (1949). This, Stryker Employment, does not do.   As explained above, given Mr. Buczek testified that until 2024 he had no involvement in the drafting of the compensation plans, he does not know who

drafted the compensation plans, he did not speak to anyone who did so, and he did not research who drafted the compensation plans, the one line in his declaration will not satisfy the evidentiary requirement.[11]. There is no competent evidence before the Court that Stryker Employment "placed" the names "Stryker" or "Stryker Medical" on the plans "with the intention of authenticating the writing" or that Stryker Employment "intend[ed] to appropriate the name(s) as a signature." The evidentiary failure is dispositive.

Stryker Employment is a separate legal entity that is a subsidiary of Stryker Corporation.  (UMF 2) Stryker Corporation has nearly 200 subsidiaries worldwide, including 12 in the United States that use the term "Stryker" in their names. (UMF 3)  Mr. Buzcek admitted no one can discern from the face of the compensation plans what legal entity was intended by the plans use of the terms "Stryker" and "Stryker Medical." (UMF 47, 53, 59) Stryker Corporation treats all of its subsidiaries as separate legal entities, as evidence by the fact that its counsel requested dismissal of these entities on the basis that the separate legal entities were not Plaintiff's employer.[12]

Stryker Employment's attempt to use the Commercial Code also ignores the proper framework under which this Court must analyze the Section 2751 claim. "[S]tatutes governing conditions of employment are to be construed broadly in favor of protecting employees." *Murphy*, 40 Cal. 4th at 1103. This basic principle applies to Section 2751.  See *Swafford*, 408 F. Supp. 3d at 1153 (Section 2751, as a statute governing the conditions of employment, should be construed broadly in favor of protecting employees). Importantly, the *Walker v. Howmedica Osteonics Corp.*, 2023 WL 3806356, at *1-*3, *13 (S.D. Cal. June 2, 2023), court rejected Stryker Employment's argument. When interpreted liberally, as this Court must do, there is no question Stryker Employment did not comply with Section 2751, as neither its nor Mr. Graham's signature appear on the compensation plans.

## VII.    ISSUES OF FACT EXIST PRECLUDING SUMMARY JUDGMENT ON MR. GRAHAM'S FIRST CAUSE OF ACTION FOR FAILURE TO PAY WAGES OWED

---

[11] Declaration of Robin G. Workman In Support Of Opposition to Defendant's Motion for Summary Judgment, etc and in Support of Plaintiff's Cross-Motion ("Workman Dec."), Exhibit B at 22:3-23:4, 108:17-25, 111:21-112:10, 134:14-21, 170:1-15.
[12] Workman Dec., ¶ 33, Exhibit FF.

Under the statutory definition found in Labor Code section 200, "[w]ages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, *commission basis,* or other method of calculation." (Emphasis added). As such, there is no question, commissions constitute "wages."

Labor Code sections 201-203, establish the time frame in which employers must pay wages. Labor Code section 204, which can serve as a predicate violation for PAGA and UCL violations, confirms the same. As the California Supreme Court outlined long ago in *Kerr's Catering Serv. V. Department of Industrial Relations,* 57 Cal. 2d. 319, 325 (1962), "[w]ages of workers in California have long been accorded a special status generally beyond the reach of claims by creditors including those of an employer." The *Kerr's* Court iterated "California courts have recognized the public policy in favor of full and prompt payment of wages due an employee." Id. 326. The Court also iterated the harm caused by taking deductions from employees' wages for cash shortages, or other costs of doing business, and explained that engaging in this activity violates the Labor Code. Id. at 328-29. Such deductions violate Labor Code section 221.

Employing an ostrich approach, Stryker Employment buries its head in the sand, ignoring the evidence Mr. Graham submits in support of this claim. There is no question Stryker Employment **reduced** his compensation, and took deductions from his wages, to avoid its reimbursement obligations under Labor Code section 2802. Mr. Graham alleges that through these actions, Stryker Employment did not pay him all of the wages to which he was due. Stryker Employment's sole rejoinder to this assertion is that it has the unfettered right to engage in these actions because its right to do so is set forth in the compensation plans. As outlined above, Labor Code section 2804 precludes this argument. Again, an employee cannot contract away his or her right to reimbursement under section 2802.

As explained fully above, the cases on which Stryker Employment rely to support its arguments are not applicable. This is not a circumstance where Stryker Employment

MSA MOTION (PLAINTIFF)                    -37-                    \MOTIONS\GRAHAMMSAMOTION

advanced a commission and then, due to an action of the customer causing it to lose the sale, Stryker Employment sought to "chargeback" the advance. As such, the "chargeback" cases are of no assistance. Here, the reverse actually occurred. Stryker Employment did not "advance" anything. Rather, it either *reduced or took deductions from* account managers' compensation and held this amount to satisfy its reimbursement obligations. If account managers submitted fewer requests for reimbursement than the amount withheld, Stryker Employment automatically paid account managers the amount remaining.

Stryker Employment cannot mask its actions by using euphemisms. While Stryker Employment states the "true-up", which it styled an "Expense Management Bonus," was created to "incentivize cost consciousness and efficiency," (Memorandum at 5:9-10) there were no eligibility requirements to receive this "bonus." Stryker Employment set aside, and paid back to account managers, either the reduction in their compensation or the amount of the deductions, up to the total amount withheld.

If the Court agrees with Mr. Graham, and holds that Stryker Employment's latest attempts to avoid its reimbursement obligations violated section 2802, and section 221, Stryker Employment, by definition, failed to pay Mr. Graham wages that were owed to him, i.e., either the .5% or 1% reduction and the $2,000 deduction from his wages. No amount of wordsmithing can avoid this fact.

Additionally, Stryker Employment, by its own admission did not timely pay compensation owed to Mr. Graham. By its own admission, starting in July of 2023, when Stryker Employment transferred to the SAP system, it routinely paid commissions late, and they were inaccurate, as it could not compute the commission payments. A trove of communications from Stryker Employment to the account managers establishes this fact. (Graham Dec. Ex. C) In addition, Stryker Employment did not pay Mr. Graham all compensation owned to him on either the last day of his employment, when it was due, or within 72 hours of his employment. (Graham Dec. Ex. D) Rather, Stryker did not pay Mr. Graham compensation that was due until well after this date, making payments in late

January of 2024, in March of 2024, and in August of 2024, some seven months after Mr. Graham's employment ceased.  (Graham Dec. ¶ 19, Ex. F)

While Stryker Employment spends much ink on an alleged overpayment to Mr. Graham, this fact is irrelevant.  This Court denied Stryker Employment's request to amend its complaint to add a claim for offset.  (Docket # 41)  In addition, Mr. Graham outlines in his declaration facts disputing any claim of overpayment.  (Graham Dec.¶ 20)  The fact that Stryker Employment sent Mr. Graham three commission checks following the cessation of his employment, belies its assertion that he was not owed any wages at his termination or that any overpayment occured.  As outlined in Mr. Graham's Objections to Evidence, even if this assertion were relevant, Mr. Buczek does not present admissible evidence to establish this fact.

The question of willfulness also raises issues of fact.  Based on the prior actions against the Stryker entities, Stryker Employment, and its counsel, were well aware of Stryker Employment's obligations under Section 2802.  By concocting a scheme to avoid these obligations, and thereby pay account managers all wages when due, most definitely could constitute "willful" actions, thereby giving rise to liability under Labor Code section 203.

## VIII.    ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON MR. GRAHAM'S LABOR CODE SECTION 226 CLAIM

Stryker Employment cannot prevail on Mr. Graham's Labor Code section 226 ("Section 226") claim, because Mr. Graham, at a minimum, raised issues of facts regarding whether Stryker Employment violated Section 226.

Section 226(a) requires employers "semimonthly or at the time of each payment of wages" to furnish to their employee, "either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash, an accurate itemized statement in writing showing," among other things: (1) gross wages earned, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, and (5) net wages earned.  By definition, if Stryker Employment did not pay Mr. Graham all the wages owed

to him, either due to the reductions in, or deductions from, his compensation, Stryker Employment did not furnish "accurate" wage statements, as they did not list all gross or net wages earned.  In addition, Stryker Employment did not list all the deductions taken from Mr. Graham's compensation, as they did not separately list the $2,000 deductions taken to cover expense reimbursements.

Again, at a minimum, questions of fact exist as to whether Stryker Employment had a "good faith" belief that it could engage in the schemes outlined above, and withhold the compensation owed to account managers, and take significant deductions, $2,000 a month, from account managers' commissions, and then fail to set forth the deductions on the wage statements could meet the "good faith" exception to Section 226.

**VIV.   CONCLUSION**

For all the foregoing reasons, Mr. Graham respectfully requests that the Court grant his motion for summary adjudication in its entirety and find that: (1) Stryker Employment is liable to Mr. Graham on his individual claim funder Section 2802; and (2) Stryker Employment is liable to Mr. Graham in his individual claims under the UCL and PAGA, to the extent those claims are predicated on Stryker Employment's violations of Section 2751 and 2802.

Date: June 9, 2026                              WORKMAN LAW FIRM, PC

                                                By: /s/Robin G. Workman
                                                    Robin G. Workman
                                                    *Attorneys for Jonathan Graham, and all*
                                                    *others similarly situated*